IRVING, J.,
Dissenting.
¶ 31. The Court reverses Ransom’s robbery conviction because it finds that Ransom’s trial attorney was ineffective. The alleged ineffectiveness stems from trial counsel’s failure to provide reciprocal discovery which resulted in three defense alibi witnesses being precluded from testifying. The three witnesses were Ransom’s mother, girlfriend, and sister, each of whom allegedly would have corroborated Ransom’s assertion that on the day that the robbery was committed Ransom’s cousin, Vincent McGrew, was using Ransom’s car while Ransom was at home mowing his mother’s yard.
¶ 32. Given the fact that Ransom’s defense was that his cousin, McGrew, committed the robbery, the majority concludes that the testimony of these three witnesses likely would have changed the outcome of the case. I disagree; therefore, I respectfully dissent, and begin by reciting some facts that are not mentioned in the Court’s opinion.
¶ 33. The robbery occurred on September 15, 1997. Ransom was not arrested until February 1998, approximately six months after the robbery occurred. He turned himself in after seeing himself listed in a “Most Wanted” photograph published in the local newspaper. Prior to *716 seeing himself in the newspaper in February 1998, he had not kept a record of his daily activities. He had no reason to do so; yet, after he was arrested, he was able to recall exactly what he was doing six months earlier on September 15, 1997. He said that he was at his mother’s house mowing the lawn. He was not able to cite a single event or occurrence which caused his whereabouts on that particular day to be memorialized for later recall. In the absence of some memorable event which aided Ransom’s ability to recall his precise activity six months earlier, I do not think a jury would embrace his statement that he was mowing his mother’s lawn.
¶ 34. When Ransom was arrested in February 1998, he told Detective A1 Taylor of the Jackson Police Department that the perpetrator of the crime “possibly could have been” Ransom’s cousin, Vincent McGrew, because McGrew had borrowed his car from time to time. He did not state, as the majority asserts, that McGrew had in fact borrowed his car on September 15, 1997, the date of the robbery.
¶ 35. During the trial, Ransom’s counsel did not make a proffer as to the substance of what the testimony of the three witnesses would be. The State, however, advised the court of the substance of what the State had learned regarding the sister’s and mother’s testimony. The record reflects that Ransom’s sister, Charlene Ransom, told the State’s investigator “that she was, in fact, at home with the defendant.” No date or time line was specified. The record further reflects that Ransom’s mother, Mattie Ransom, would testify to substantially the same thing as her daughter, and additionally, would testify that the “car [used in the robbery] had been missing for some time.” The State did not say what Marcy Thurman, Ransom’s girlfriend, would testify to. However, the State did advise the court that it was the State’s understanding that Marcy “was working at the time of the incident on September 15 of 1997.”
¶ 36. While no suggestion was offered during the trial as to what Marcy’s testimony would have been, Marcy did testify during the hearing on Ransom’s motion for a new trial. In fact, she was the only witness to testify during the hearing. There, she testified that on September 15, 1997, Vincent McGrew, using Ransom’s car, took her to work around 10:00 a.m. and picked her back up around 4:30 p.m. She offered no insight as to whether McGrew kept the car the entire time during the interim. Neither did she have any specific recollection of that day. She based her testimony on what her work schedule showed for that day. She testified that Ransom was at home mowing his mother’s yard on the day of the robbery, that his mother had a big yard, and that it took all day to cut the grass. However, it is clear that she had no way of knowing what Ransom did on the day in question because, based on her testimony, she worked from 10:00 a.m. until 4:30 p.m. at her place of employment, a Subway restaurant on Terry Road in south Jackson. Ransom’s mother’s house was located on Pine Grove Road near Pocahontas. She later acknowledged during redirect examination that the source of her information as to Ransom’s whereabouts on the day in question was Ransom himself.
¶ 37. According to Detective Taylor, Leigh White, the victim of the robbery, immediately identified Ransom when she was shown a photo lineup the day after the robbery. She did not hesitate in identifying Ransom. Six months later when Lou Morlino, White’s boss, was shown the same photo lineup, with the pictures arranged in a different order, he immediately identified *717 Ransom. Both White and Morlino had ample time to observe the attacker.
¶ 38. According to White, she went into the post office where she was confronted by a person who snatched her handbag and ran away. She yelled at the robber and ran after him. The robber then turned around, came back toward her, hit her in the face, and knocked her down. White’s boss, Lou Morlino, came outside when he saw White lying against the glass door of the post office. Morlino chased the robber and got as close as the driver’s side of the robber’s vehicle but was unable to detain him. Both White and Morlino witnessed the robber getting into the getaway vehicle. Each gave a physical description of the robber to the police. White was able to provide a description of the vehicle, while both White and Morlino were able to recall the license plate number. Morlino indicated that when he ran alongside of the robber’s vehicle, there was no other person in the vehicle but the robber.
¶ 39. Assuming arguendo that Ransom’s trial counsel was derelict in not discovering until the day prior to the trial that McGrew was not in jail on the day of the robbery, the ultimate question is can we say that the trial court abused its discretion in not finding that the outcome of the case would have been different, given the fact that Ransom testified to exactly what the witnesses presumably would have testified to. What additional testimony would have been received?
¶ 40. Ransom’s mother and sister presumably would have testified that Ransom was at home all day, mowing the mother’s yard all day. But, the mother would have also testified that the car used in the robbery had been missing for some time, thus contradicting Ransom’s testimony that he had loaned his car to McGrew on the day in question. As already noted, the girlfriend likewise would have testified that Ransom was at home all day, mowing his mother’s yard. But the source of that information was Ransom himself. The jury heard Ransom say he was at home all day, mowing his mother’s yard. McGrew was subpoenaed instanter. He appeared and refused to testify on the basis of his Fifth Amendment right against self incrimination. So, where is the persuasive and compelling evidence that, more than likely, would have changed the outcome of the case? Now that I have reviewed the evidence, as well as the disallowed evidence, I turn to a discussion of the issue.
¶ 41. First, I point out that under our standard of review, our task is not to determine whether the disallowed witnesses’s testimony likely would have made a difference in the result of the trial had the witnesses been allowed to testify, but to determine whether the trial judge abused his discretion in disallowing the testimony and in refusing to grant Ransom a new trial. There is a substantial difference in making the initial decision and in reviewing that decision for an abuse of discretion once it has been made by the proper judicial officer. It is well settled law that the admission of evidence at trial is within the sole discretion of the trial judge. While this court may have decided differently if it was the entity making the initial decision, it is not to conduct its review as if it were the initial decision maker.
¶ 42. With the proper standard of review in mind, it is mystifying to me how the majority can find that “there is a reasonable probability that the outcome of the trial would have been different if some minimal pretrial investigation had been performed.” Presumably, what the majority means by this statement is that defense counsel would have learned earlier that McGrew was not in jail on the day that the *718 robbery was committed. I assume the assumption is that, armed with that knowledge, defense counsel would have then realized the importance of calling Ransom’s mother, girlfriend, and sister to corroborate Ransom’s ■ story that his cousin, McGrew, had Ransom’s car on the day in question. Consequently, defense counsel would have made a timely disclosure of these witnesses so that they would have been allowed to testify. I assume the argument continues that, once these witnesses were put on the witness stand, the jury would have been more likely to have believed them and Ransom rather than to have believed the victims and Detective Taylor. With respect for my colleagues, I must say that I find this supposition not only unpersuasive — when weighed against the eyewitness testimony of the two witnesses, White, the victim, and Morlino, who saw the perpetrator of the strong-armed robbery and gave chase — but contrary to reason and dismissive of the common recognition that juries are not likely to give greater weight to the testimony of the defendant and his loved ones than they are to the unimpeached testimony of victims and police officers. I am confident, however, that this recognition was not lost on the trial judge. Therefore, this is why, in my opinion, it is more than a permissible indulgence for the majority, as a part of a reviewing court, to implicitly say that the trial judge abused his discretion when he did not allow the very tenuous testimony of Ransom’s loved ones.
¶43. The majority suggests that this writer is usurping the role of the jury. That is not the case. I simply disagree with the majority’s finding “that with the alibi witnesses’s testimony there is a reasonable probability that the outcome of the trial would have been different.” It seems to me that the majority cannot make that finding without engaging in the same type analysis that I have. We both have analyzed the potential evidence which was placed before the trial judge but have reached different conclusions to be drawn from the trial judge’s treatment of that evidence. I do not believe for one nanosecond that the disallowed evidence was so probative of Ransom’s innocence that it can be said by a reviewing court that the refusal of the trial court to allow it constitutes an abuse of discretion.
¶ 44. Therefore, I, unlike the majority, do not believe that the trial court erred when it necessarily determined that Ransom failed to carry his burden with respect to the Strickland test for finding ineffective assistance of counsel. While trial counsel was certainly derelict in not making timely disclosure of the alibi witnesses, I do not find that his performance, or lack thereof, was so deficient as to warrant a finding that Ransom was denied the effective assistance of counsel.
¶ 45. Since Ransom had accused McGrew of being the person who committed the robbery, I think if the jury was disposed to accepting Ransom’s version that it was McGrew and not he who committed the robbery, McGrow’s refusal to testify on the basis that he did not want to incriminate himself would have been sufficient to help them get there. I fail to see how the attenuated testimony of Ransom’s loved ones probably would have made a difference in the outcome of the case. In light of the posture taken by McGrew, it may be that the jury reasoned that both he and Ransom were involved. Obviously, I do not know what influenced this jury’s decision, but I do not think that the refusal of the trial judge to allow the additional testimony likely would have made any difference. That being the case, as I have already observed, I cannot find any abuse of discretion on the part of the trial judge in not permitting the additional testimony.
*719 ¶ 46. I close with this warning to my colleagues in the majority: you shall rue this day that you lowered the evidentiary bar for a criminal defendant’s obtainment of a new trial on the basis of ineffective assistance of counsel. I foresee the day— if your decision is allowed to stand — when the judicial system will be flooded with cases in which a defendant claims entitlement to a new trial because his attorney did not put a family member on the witness stand to vouch for the veracity of the defendant’s story that he was at home watching a movie when the crime occurred. Try as you may, but it will be exceedingly difficult, if not impossible, to explain why that defendant should not be treated as generous as you have treated Ransom.
¶ 47. For the reasons stated, I respectfully dissent. I would affirm the judgment and sentence of the trial court.
KING, C.J., AND LEE, P.J., JOIN THIS SEPARATE WRITTEN OPINION.